Michael J. McCue
Nevada Bar No. 6055
MMcCue@LRRLaw.com
Jonathan W. Fountain
Nevada Bar No. 10351
JFountain@LRRLaw.com
Meng Zhong
Nevada Bar No. 12145
MZhong@LRRLaw.com
LEWIS ROCA ROTHGERBER LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169-5996
702.949.8200 (tel.)
702.949.8398 (fax)

*Attorneys for Plaintiff*
*MGM Resorts International*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MGM RESORTS INTERNATIONAL, a Delaware corporation, | Case No.:  2:14-cv-01510-JAD-CWH |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| M LIFE, INC., a Nevada corporation; M'LIFE WELLNESS, LLC, a Nevada limited liability company; M'LIFE NEVADA, LLC, a Nevada limited liability company; DANIEL LUTZ, an individual; and DARVIN GOMEZ, an individual, | |
| Defendants. | |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff MGM Resorts International ("Plaintiff" or "MGM") hereby moves the Court for a preliminary injunction enjoining Defendants M Life, Inc., M'Life Wellness, LLC, M'Life Nevada, LLC, Daniel Lutz and Darvin Gomez (collectively, the "Defendants") from using the M'Life Mark in connection with the operation of Defendants' medical marijuana dispensary in Las Vegas, Nevada,  and on Defendants' website and domain name <www.mlifewellness.com>.  This motion is supported by the following memorandum of law, the accompanying declarations of April D. Chaparian (the "Chaparian Decl.") and Jonathan W. Fountain (the "Fountain Decl."), the exhibits attached

-1-

5040152_1

1  thereto, and by any oral argument the Court may require or allow.

2  **INTRODUCTION**

3          Defendant decided to adopt a mark that is essentially identical to MGM's well known M

4  LIFE mark for a marijuana dispensary in MGM's backyard.  Of course, Defendants had numerous

5  options to choose from, yet they obviously decided that it would be financially beneficial to trade

6  off of the goodwill and reputation of MGM's established M LIFE brand to gain instant consumer

7  recognition.   As a highly regulated business, publicly traded company, and prominent corporate

8  member of the Las Vegas community, MGM has strived to  ensure its excellent reputation.  Now,

9  Defendants seek to trade on and perhaps tarnish that reputation by associating it with their planned

10  marijuana dispensary.

11          Accordingly, this is an action by MGM for trademark dilution, unfair competition and

12  cybersquatting arising out of Defendants' unauthorized and unlawful use in commerce of the

13  M'LIFE mark in connection with Defendants' operation of a medical marijuana dispensary (either

14  opened or soon to be opened) in Las Vegas, Nevada, and on the website and domain name

15  <www.mlifewellness.com>.   Defendants' use of the M'LIFE mark is confusingly similar to

16  MGM's well-recognized and famous M LIFE mark, which it uses in connection with its guest

17  rewards program.  MGM owns numerous federal trademark registrations for M LIFE and actively

18  promotes and advertises its mark throughout the United States.  Defendants' use of a nearly

19  identical mark for the promotion and operation of a medical marijuana business is likely to dilute

20  the distinctiveness of the M LIFE mark, tarnish MGM's reputation and goodwill, and cause

21  confusion.  Accordingly, MGM seeks a preliminary injunction prohibiting Defendants from using

22  the M'LIFE mark in commerce.

23  **STATEMENT OF FACTS**

24  ***MGM And Its M LIFE Mark***

25          Plaintiff MGM Resorts International (defined above as "MGM") is a publicly traded

26  Delaware corporation whose principal place of business is located in Las Vegas, Nevada.

27  (Chaparian Decl. ¶ 3.)  MGM is one of the world's leading global hospitality companies, operating

28  a portfolio of destination resort casinos.  (*Id.*)

5040152_1

M LIFE is MGM's guest rewards program that gives members the power to earn rewards for the amount they spend at fifteen of MGM's properties across the U.S.: Aria, Beau Rivage, Bellagio, Delano Las Vegas, Excalibur, Gold Strike Tunica, Luxor, Mandalay Bay, MGM Grand, The Mirage, Monte Carlo, New York-New York, The Signature at MGM Grand, MGM Grand Detroit, and Vdara.  (*Id*. ¶ 4 & Ex. A.)

Rewards include discounts, comps, upgrades, exclusive special offers, invitations to members' only events, presale access to concert and show tickets, and M LIFE Moments: signature experiences such as choosing the music for the dancing fountains at the Bellagio, getting a private cooking lesson with a world-renowned chef, or swimming with the dolphins at the Mirage.  (*Id*. ¶ 5.)  Currently, M LIFE has over *34 million* members.  (*Id*. ¶ 6.)  The total annual amount of comps/rewards traceable to M LIFE membership accounts totals in the hundreds of millions of dollars.  (*Id*.)   The total annual amount of goods/services purchased by M LIFE members also totals in the hundreds of millions of dollars.  (*Id*.)

MGM launched the M LIFE guest rewards program in January 2010.  (*Id*. ¶ 7.)  Since that time, MGM has spent tens of millions of dollars to advertise and promote the M LIFE guest rewards program in a variety of media, including, on the internet, billboards, print ads, television ads, radio ads, brochures, magazines, social media, and on property advertising.  (*Id*.)  MGM also markets its M LIFE guest rewards program through certain dedicated means, including the M LIFE website located at <http://www.mlife.com>; M LIFE TV, the exclusive in-room channel at MGM's resorts; the M LIFE TV YouTube channel; M LIFE magazine; and social media including the M LIFE Facebook page, the M LIFE Twitter feed where members can share their favorite Las Vegas moments using #LivetheMlife, and the M LIFE mobile smartphone application that allows members to manage their M LIFE accounts.  (*Id*. and Exs. B, C, D.)  MGM estimates that more than one hundred million consumers have seen advertising for the M LIFE guest rewards program.  (*Id*. ¶ 7.)  In July 2014 alone, the website <www.mlife.com> generated millions in revenue and hundreds of thousands of unique logins.  (*Id*. ¶ 8.)

/ / /

/ / /

-3-

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

LEWIS ROCA
ROTHGERBER

M LIFE is an extraordinarily well-recognized guest rewards program in the resort hotel-casino industry. (*Id.* ¶ 9.) The degree of actual recognition is high given that the number of M life members is over approximately 12 times the population of the entire State of Nevada and that it is a highly advertised rewards program promoted by the top resort operator on the Las Vegas Strip. (*Id.*)

### *Plaintiff's M LIFE Marks*

MGM has obtained and owns several federal trademark registrations, on the Principal Register of the United States Patent and Trademark Office ("USPTO"), for the M LIFE mark and for similar marks, including the following:

| Mark | Reg. No. | Class/Goods & Services |
|------|----------|------------------------|
| **M LIFE** | 4,092,023 | 43:  Hotel and restaurant services for preferred customers |
| **M LIFE TV** | 4,172,398 | 38:  Broadcasting of video programming in the fields of entertainment, casinos and general interest via the internet and in-room television |
| **M LIFE TV** | 4,172,400 | 41:  Entertainment and educational services, namely, an on-going series in the fields of entertainment, casinos and general interest provided through webcasts and in-room television programming |
| **M LIFE** | 4,023,626 | 41:  Casinos; Providing casino services featuring a casino players rewards program |
| **M LIFE** | 4,023,627 | 35:  Customer loyalty services, namely, customer loyalty programs featuring loyalty coupons and loyalty points that provide casino benefit to reward repeat customers |
| **M LIFE CURATED LIVING**[1] | 4,495,112 | 35:  Customer services in the field of residential real estate |

(*Id.* ¶ 10 & Ex. E, collectively, with MGM's common law rights, the "M LIFE Marks.")  In fact, a search for the phrase "M LIFE" on the USPTO's Trademark Electronic Search System ("TESS") reveals that there is no person or entity (other than MGM) who holds an active federal trademark registration for the M LIFE mark for any good or service. (*Id.* ¶ 11 & Ex. F.)  MGM's federal trademark registrations for the M LIFE Marks are valid and subsisting, and have not been abandoned, cancelled, or revoked. (*Id.* ¶ 12.)

---

[1]  CityCenter Land, LLC holds the registration for "M Life Curated Living."  (*See* Ex. E to Chaparian Decl.)  MGM co-owns CityCenter Land, LLC.  (*Id.* ¶ 10.)

5040152_1

Based on the widespread recognition of the M LIFE Marks in Las Vegas, Nevada, and throughout the United States, and based on other relevant factors, the M LIFE Marks have become famous in the State of Nevada and throughout the United States.  (*Id*. ¶ 13.)  Based on its common law and statutory rights in the famous M LIFE Marks, MGM has the right to stop others from using the same or similar marks for related as well as for unrelated goods and services. (*Id*.)

### *The Defendants' M'Life Business*

Defendants recently began using M'LIFE (the "M'LIFE Mark") in connection with the advertisement, promotion, and planned operation of a medical marijuana dispensary and medical marijuana education and consulting business located at 2800 S. Highland Drive, Las Vegas, Nevada.  (*Id*. ¶ 14 & Ex. G.)  Defendants formed the corporate entities through which they operate in April and in July 2014 and registered their domain name <www.mlifewellness.com> with GoDaddy.com, Inc. ("GoDaddy") on July 16, 2014.  (*See* Fountain Decl. ¶¶ 3-4 & Exs. A & B thereto.)

### *Defendants Refused To Stop Use Of The M'LIFE Mark*

When MGM became aware of Defendants' use of the M'LIFE Mark and their intent to open a medical marijuana dispensary under that name, MGM's counsel sent a letter to Defendants demanding that they immediately cease and desist from any and all use of the M'LIFE Mark.  (*See* Fountain Decl. ¶ 5 & Ex. C.)  Defendants refused to cease and desist using the M'LIFE Mark. (*Id*.)

### LEGAL STANDARD

To prevail on a motion for preliminary injunction, a moving party must demonstrate "he is likely to succeed on the merits; he is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in its favor; and, that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The alternative test requires that a plaintiff demonstrate either: (a) a combination of probable success on the merits and the possibility of irreparable injury; or (b) that serious questions going to the merits are raised and the balance of hardships tips sharply in his favor.  *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007).  "These two formulations represent two points on a sliding scale in which the required

-5-

degree of irreparable harm increases as the probability of success decreases." *Id.* "Serious questions going to the merits" means "that there is at least a reasonable probability of success on the merits." *Conair Corp. v. Le Angelique, Inc.*, No. 2:14-cv-01149-RCJ-PAL, slip op. at 6 (D. Nev. Sep. 15, 2014). "Reasonable probability" appears to be the most lenient position on the sliding scale that can satisfy the requirement that success be "likely." *Id.*

As discussed below, MGM is entitled to an injunction because it is likely to succeed on the merits but also because at the very least, it has shown a serious question on the merits with the balance of hardships tipping sharply in its favor.

## ARGUMENT

The Court should enter a preliminary injunction prohibiting Defendants, their respective officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, from using the M'LIFE Mark in connection with Defendants' advertisement, promotion, and operation of a medical marijuana dispensary as well as on Defendants' website and in the domain name, <www.mlifewellness.com>.

## I.  MGM IS LIKELY TO SUCCEED ON THE MERITS AT TRIAL

### A.  MGM Will Likely Prevail On Its State Dilution Claim (Count II)

Nevada law permits the trademark holder to enjoin infringing use of a famous mark. Nev. Rev. Stat. § 600.435.[2]   In the interests of efficiency, however, MGM will only address its state dilution claim.

Nevada's state dilution statute entitles the owner of a mark to enjoin commercial use of the mark by another if:

    1. The mark is famous;

    2. defendants used the mark after the mark became famous; and

---

[2] In fact, a trademark dilution claim under Nevada law is "substantially similar" to a federal trademark dilution claim. *WEC Holdings, LLC v. Juarez*, No. 2:07-CV-00137-BES-PAL, 2008 WL 345792, at *6 (D. Nev. Feb. 5, 2008) (adding "[t]he eight factors for determining whether a mark is famous in Nevada are equivalent to the factors used in a famousness determination under 15 U.S.C. § 1125(c)(1)(A)-(H)"); *see also* Jennifer Craft, Esq., *You Don't Have To Be Intellectual To Understand Intellectual Property: An Introduction To Five Basic IP Principles*, 14 Nev. Law. 8, 10 (Nov. 2006) ("With respect to registered state marks, note that the Nevada Revised Statutes for the most part contain similar language to the applicable federal statutes").

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

LEWIS ROCA
ROTHGERBER

5040152_1

3. the use of the mark causes dilution.

Nev. Rev. Stat. § 600.435.

### 1.  The M LIFE Marks Are Famous In Nevada

In determining whether a mark is famous in this State, the court shall consider, without limitation, the following factors:

(a)     The degree of inherent or acquired distinctiveness of the mark in this State.

(b)     The duration and extent of use of the mark in connection with the goods and services with which the mark is used.

(c)     The duration and extent of advertisement and promotion of the mark in this State.

(d)     The geographical extent of the trading area in which the mark is used.

(e)     The channels of trade for the goods or services with which the mark is used.

(f)     The degree of recognition of the mark in the trading areas and channels of trade in this State used by the owner of the mark and the person against whom the injunction is sought.

(g)     The nature and extent of use of the same or similar mark by other persons.

(h)     Whether the mark is registered in this State or registered in the United States Patent and Trademark Office pursuant to federal law.

Nev. Rev. Stat. § 600.435.   Applying these factors here, it is clear that the M LIFE Marks are famous within Nevada because they are widely recognized as a designation of the source of MGM's goods and services.

First, the M'LIFE Mark has a high degree of inherent or acquired distinctiveness.  Courts have developed a litmus test to help measure a tradename's distinctiveness.  *A.L.M.N., Inc. v. Rosoff*, 757 P.2d 1319, 1321–22, 608 (Nev. 1988).  Tradenames are divided into four categories, falling on a spectrum of distinctiveness from generic (afforded no protection) through descriptive (entitled to no protection absent a showing of secondary meaning) and suggestive (entitled to moderate protection) through arbitrary (entitled to more protection) or fanciful (entitled to maximum protection).  *Id.*: *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (discussing spectrum).  Arbitrary marks are marks that "consists of words commonly

LEWIS ROCA
ROTHGERBER

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

5040152_1

used in the English language" but "have no intrinsic connection to the product with which the mark is used." *Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999).    In contrast, suggestive marks require some imagination for consumers to determine their significance in relation to the product with which the mark is used.  *See id.*  In addition, a trademark may become highly distinctive through the considerable advertising efforts of its owner.  *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1144 (9th Cir.2002) (recognizing that an otherwise inherently weak mark "may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition"); *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1138 (D. Minn. 1981) ("The distinctiveness may be the result of the mark's extraordinary uniqueness or a considerable advertising effort").

Here, M LIFE is arbitrary because it has no intrinsic connection to the services provided by MGM – guest rewards services.  At a minimum, M LIFE is suggestive as the "M" might suggest some affiliation with MGM, but does not identify itself with guest rewards services.  *See, e.g.*, *Well Care Pharmacy II, LLC v. W' Care, LLC*, No. 2:13–cv–00540–GMN–VCF, 2013 WL 3200111, 3, 999, Slip Copy (D. Nev. June 24, 2013) (holding marks that merely suggest affiliation with a general field is suggestive).  Additionally, since the inception of the M LIFE rewards program, MGM has spent tens of millions of dollars through a diverse array of marketing channels to promote the M LIFE brand.  (Chaparian Decl. ¶ 7 & Exs. B, C, D.)  Thus, the M LIFE Mark's distinctiveness has only grown year to year.  For these reasons, MGM's M LIFE mark is highly distinctive.

Second, the duration and extent of MGM's sales of goods and/or services offered under the M LIFE Marks have been substantial.  The M LIFE guest rewards program gives members the power to earn rewards for the amount they spend at fifteen of MGM's resort hotel casino destinations, including the world-famous Bellagio, MGM Grand, and The Mirage.  (*See* Chaparian Decl. ¶ 4.)  On an annual basis, MGM has given its M LIFE members rewards worth hundreds of millions of dollars through the M LIFE rewards program.  (*Id.* ¶ 6.)

Third, the extent and duration of MGM's advertising of its M LIFE guest rewards program have been long and far reaching.  MGM promotes its M LIFE guest rewards program through

5040152_1

every imaginable channel, including billboards, print ads, television ads, radio ads, brochures, magazines, social media, and on property advertising.  (*See* Chaparian Decl. ¶ 7 & Exs. B, C, D.) MGM has a dedicated magazine, TV channel, YouTube channel, smartphone app, and numerous social media accounts for the M LIFE guest rewards program.  (*Id.*)  MGM has spent tens of millions of dollars annually to promote and advertise its M LIFE guest rewards program.  (*Id.* ¶ 7.) MGM estimates that more than one hundred million consumers have seen advertising for the M LIFE guest rewards program.  (*Id.*)  In July 2014 alone, MGM's <www.mlife.com> website generated millions in revenue and hundreds of thousands of unique logins.  (*Id.* ¶ 8.)

Fourth, the M LIFE guest rewards program is offered throughout the U.S. but has a strong emphasis in Las Vegas, Nevada – where Defendants' business also resides – because MGM operates many of its world-famous hotel resorts in Las Vegas, Nevada (Aria, Bellagio, Delano Las Vegas, Excalibur, Luxor, Mandalay Bay, MGM Grand Hotel & Casino, The Mirage, Monte Carlo, New York-New York, The Signature at MGM Grand, and Vdara).  (*Id.* ¶ 3.)

Fifth, M LIFE members can access the guest rewards program through a wide variety of channels, including on location, through the internet, and through a mobile phone app.  (*Id.* ¶ 7.)

Sixth, the actual recognition of the M LIFE Marks is high.  M LIFE is an extraordinarily well-recognized guest rewards program in the resort hotel-casino industry.  (*Id.* ¶ 9.)

Seventh, no other individual holds an active federal registration for the mark M LIFE.  (*Id.* ¶ 11 & Ex. F.)

Finally, MGM's M LIFE Marks are registered with the USPTO.  (*Id.* ¶ 10 & Ex. E.)

In sum, analysis of the factors under the Nevada dilution statute favors a finding of fame for the M LIFE Marks.

## 2. Defendants Began Using Their M'LIFE Mark After MGM's M LIFE Marks Became Famous

Defendants have only recently begun using their confusingly similar M'LIFE Mark.  (*See* Fountain Decl. ¶¶ 3-4 & Exs. A and B.)  Defendants formed and registered the corporate entities through which they do business in April and in July 2014.  (*Id.*)  Defendants registered the <www.mlifewellness.com> domain name on July 16, 2014.  (*Id.*)

5040152_1

In that same month, July 2014, MGM's M LIFE rewards program had tens of millions of members (Chaparian Decl. ¶ 6) and by the second quarter of 2014, M LIFE had already established itself as a highly-recognizable brand within the resort hotel-casino industry.  (*Id.* ¶ 9.)

### 3.  Defendants' Use of the M'LIFE Mark Dilutes the Distinctiveness of MGM's M LIFE Marks

"Dilution" means a lessening in the capacity of a mark that is famous to identify and distinguish goods or services regardless of whether consumers are likely to be confused or the parties compete.   Nev. Rev. Stat. § 600.435(5)(b).   Dilution by tarnishment occurs when a defendant's unauthorized use of a mark "tarnish[es], degrade[s], or dilute[s] the distinctive quality of the mark."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:69 (4th ed. 2006 & Supp. 2014).  As one court has stated:

> A trademark is tarnished when consumer capacity to associate it with the appropriate products or services has been diminished.   The threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark . . . .

*L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 31 (1st Cir. 1987) (citations omitted), *cert. denied*, 483 U.S. 1013, 107 S. Ct. 3254 (1987).

For instance, dilution by tarnishment has been found when a defendant advertises drugs (like marijuana) using the plaintiff's mark.  *See, e.g.*, *Lorillard Tobacco Co. v. California Imports, LLC*, 886 F. Supp. 2d 529, 535 (E.D. Va. 2012) (advertising marijuana-like product under plaintiff's mark caused dilution, leading to judgment in favor of plaintiff); *Pepsico, Inc. v. #1 Wholesale, LLC*, No. 07-CV-367, 2007 WL 2142294, at *4 (N.D. Ga. July 20, 2007) (changing PEPSI cans into "stash cans" to store concealed materials such as illegal drugs is likely to tarnish the PEPSI mark); *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F. Supp. 1183, 1188–89 (E.D.N.Y. 1972) (granting injunction to plaintiff because defendants' "ENJOY COCAINE" ad looked identical to that used by Coca-Cola, causing tarnishment); *see also McCarthy*, *supra* § 24.89 (listing examples); Richard A. Posner, *When Is Parody Fair Use?*, 21 J. Legal Stud. 67, 75 (1992) ("The idea is that the reputation built up by Coca-Cola may be impaired by the association of its trademarks with shoddy or sleazy activities, such as traffic in illegal drugs."); Liem Thanh Do,

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

LEWIS ROCA
ROTHGERBER

-10-

*Dilution Standard Number: A Quantitative Approach In Proving Actual Dilution Under The Federal Trademark Dilution Act*, 11 Tex. Wesleyan L. Rev. 107, 130, n.7 (2004) ("Dilution by tarnishment cases involved the use of the famous mark . . . in connection with references to illegal drugs (such as a BUICK brand bong used to smoke marijuana)") (citation omitted).

In this case, Defendants' use of the M'LIFE Mark in connection with the operation of a medical marijuana business tarnishes MGM's reputation. Medical marijuana is a controversial topic and the public perception and image of medical marijuana is highly inconsistent with the kind of upbeat, fun, and positive image MGM has worked to associate with its M LIFE guest rewards program. (Chaparian Decl. ¶ 15.) Defendants' use of a mark that is nearly identical to MGM's M LIFE Marks draws unwarranted public attention to MGM, tarnishes its M LIFE mark, and threatens MGM with the loss of the associated good will and positive image that MGM has cultivated and developed in its M LIFE Marks over the years. *See, e.g., Lorillard Tobacco Co.*, 886 F. Supp. 2d at 537 (tarnishment found when defendant sold marijuana-like products when similar products were "sparking controversy").

For the reasons above, MGM will likely succeed on the merits of its state trademark dilution claim. Accordingly, MGM is entitled to enjoin Defendants' commercial use of the M'LIFE Mark. Nev. Rev. Stat. § 600.435(1).

### B. MGM Will Likely Prevail On Its Federal Unfair Competition Claim Under 15 U.S.C. § 1125(a) (Count III)

The test for unfair competition under the Lanham Act is the same test used for determining trademark infringement under the Lanham Act. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988). "The likelihood of confusion is the central element of trademark infringement, and the issue can be recast as the determination of whether the similarity of the marks is likely to confuse consumers about the source" of the goods or services. *GoTo.com*, 202 F.3d at 1205 (citation omitted). In determining the likelihood of confusion between two marks, the Ninth Circuit generally considers eight factors: (1) the strength of the allegedly infringed mark; (2) the proximity or relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) the degree to which the marketing channels converge; (6) the degree of

5040152_1

LEWIS ROCA ROTHGERBER

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

care consumers are likely to exercise in purchasing the goods or services; (7) the intent of the defendant in selecting the allegedly infringing mark; and (8) the likelihood that the parties will expand their product lines. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These factors favor a finding that confusion is likely here.

### 1. The M LIFE Marks Are Conceptually and Commercially Strong

Strength is a synonym for the distinctiveness of a mark, which was already discussed above. *McCarthy*, § 11:75. As previous detailed, the M LIFE mark is either arbitrary because it has no intrinsic connection to the goods and services provided by MGM, or suggestive as it would require imagination to connect the mark with MGM's goods and services.

Additionally, the M LIFE Marks are commercially strong because MGM spends considerable sums to advertise and promote the brand. (*See* Chaparian Decl. ¶ 7.) Currently, there are over 34 million M LIFE members, with hundreds of millions of dollars in guest rewards traceable to M LIFE memberships annually. (*Id.* ¶ 6.) Finally, the M LIFE Marks are commercially strong based on the absence of extensive third party use of the same or similar marks. *See, e.g., CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269-270 (4th Cir. 2006) (holding that extensive evidence of third party use is indicative of a mark's commercial weakness). Other than MGM, there is no person or entity who owns an active federal trademark registration for the M LIFE mark for any good or service. (*See* Chaparian Decl. ¶¶ 10-11 & Exs. E, F.)

Accordingly, this factor favors a finding that confusion is likely.

### 2. M LIFE And M'LIFE Are Confusingly Similar

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Goto.com*, 202 F.3d at 1206. Similarity is determined based on sight, sound and meaning and overall commercial impression of the marks as they appear in the marketplace. *Id.* In analyzing the similarity of the marks, the court is required to view the marks as a whole. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992). Here, the M LIFE and M'LIFE marks look nearly identical and sound exactly the same. Moreover, neither term offers any readily discernible meaning that would distinguish them from one another. Accordingly, the

LEWIS ROCA ROTHGERBER

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

5040152_1

overall commercial impression of MGM's M LIFE Marks and Defendants' M'LIFE Mark is substantially similar.  See, e.g., *Well Care Pharmacy*, 2013 WL 3200111, 5 (granting preliminary injunction involving marks WELL CARE and W'CARE which have "striking" similarity as one is merely a few letters and an apostrophe different from the other).

### 3. Consumers Are Likely To Falsely Believe MGM Has Some Affiliation, Connection or Association With Defendants

In comparing the relatedness of goods, direct competition is not needed.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (Plaintiffs "need not establish that the parties are direct competitors to satisfy the proximity or relatedness [of the goods] factor."); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) ("Competition between parties not automatically required to prevail on trademark infringement claim, but is one factor in determining likelihood of consumer confusion.").  Here, MGM's and the Defendants' goods and services are not in competition.  However, because of the parties' use of nearly-identical marks, an unwary consumer could falsely believe that MGM has some affiliation, connection, or association with Defendants and with Defendants' marijuana-related goods and services.   15 U.S.C. § 1125(a)(1)(A).   At the very least, the fact that Defendants' mark is nearly identical to MGM's will cause consumers to initially believe there is some affiliation, connection and association between MGM and Defendants.  Such initial interest confusion is actionable.  *Brookfield*, 174 F.3d at 1062 ("[T]he use of another's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement.") (quotation omitted).

### 4. Actual Confusion

Defendants only recently began operating under the M'LIFE mark.  Accordingly, MGM has not had an opportunity to collect evidence regarding individuals who have been confused, but intends to do so in discovery.  Regardless, evidence of actual confusion is not required for a finding that confusion is likely or for the issuance of a preliminary injunction, *Sleekcraft*, 599 F.2d at 353.

/ / /

-13-

5040152_1

### 5.  MGM's and Defendants' Marketing Channels Overlap

When marketing channels are similar, consumers are more likely to be confused by a defendant's use of identical or similar marks.  *See Sleekcraft*, 599 F.2d 353 ("convergent marketing channels increase the likelihood of confusion"); *Lozano Enterprises v. La Opinion Publ. Co.*, 44 U.S.P.Q.2d 1765, 1768 (C.D. Cal. 1997).  Here, the parties' marketing channels overlap. MGM advertises its M LIFE guest rewards program through a variety of media, including, through an extensive online presence, including a website <www.mlife.com>, on YouTube (MLifeTV channel), on Facebook, and Twitter.  (*See* Chaparian Decl. ¶ 7 & Exs. B, C, D.)  Defendants appear to also advertise extensively online using the exact same channels, including a website <www.mlifewellness.com>, YouTube, Twitter, and Facebook.  (*Id.* ¶ 14 & Ex. G.)  Because the parties' marketing channels overlap, this factor weighs in favor of a likelihood of confusion.

### 6.  The Degree of Customer Care

In evaluating the degree of care likely to be exercised by the consumer of the relevant goods, courts should employ the standard of a typical buyer exercising ordinary caution unless the buyer has expertise in the field.  *Sleekcraft*, 599 F.2d at 353.  Here, a customer of ordinary caution will not appreciate the difference between two marks that look nearly identical.  At the very least, Defendants' use of a nearly-identical mark as MGM's well-recognized M LIFE Mark will likely cause initial interest confusion.

### 7.  Defendants Intended to Cause Confusion And Trade Off of MGM's Goodwill

It is well established that a defendant's intention in adopting a mark that is similar to the plaintiff's mark is evidence of a likelihood of confusion.  For example, in *Official Airline Guides, Incorporated v. Goss*, 6 F.3d 1385 (9th Cir. 1993), the Ninth Circuit compared the plaintiff's mark OAG TRAVEL PLANNER to the defendant's use of THE TRAVEL PLANNER, and stated: "[w]hen an alleged infringer knowingly adopts a mark *similar* to another's, courts will presume an intent to deceive the public."  *Id.* at 1394 (emphasis added).  *Accord Sleekcraft*, 599 F.2d at 354 (comparing SLICKCRAFT and SLEEKCRAFT marks and stating "[w]hen the alleged infringer knowingly adopts a mark *similar* to another's, reviewing courts presume that the defendant can

5040152_1

accomplish his purpose: that is, that the public will be deceived.") (emphasis added).  Thus, as Professor McCarthy has observed, "[a] wrongful intent appears easy to infer where defendant knew of plaintiff's mark, had freedom to choose any mark and 'just happened' to choose a mark confusingly similar to plaintiff's mark."  *McCarthy* § 23:115; *see also Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir. 1948) ("This thought that a newcomer has an 'infinity' of other names to choose from without infringing upon a senior appropriation runs through the decisions like a leitmotif."); *Brookfield*, 174 F.3d at 1509 (this factor favors the plaintiff where the defendant adopted the plaintiff's mark with knowledge, constructive or actual, that it was another's trademark).  Although intent to deceive is not required to prove a likelihood of confusion, *Goto.com*, 202 F.3d at 1208, intent to deceive is strong evidence of a likelihood of confusion." *Interstellar Starship Servs. v. Rearden Commerce, Inc.*, 184 F.3d 1190, 1111 (9th Cir. 2012) (citing *Sleekcraft*, 599 F.2d at 354)).

In this case, Defendants had constructive notice of the M LIFE Marks.  15 U.S.C. § 1072 ("Registration of a mark on the principal register provided by this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof").  With constructive knowledge of MGM's mark, Defendants' adoption of a business name that "just happens" to be remarkably similar to MGM's mark supports an inference that Defendants adopted their M'LIFE Mark in bad faith.  *See, e.g.*, *Discovery Commc'ns, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1290 (C.D. Cal. 2001) (addressing intent factor and finding "Defendants were on constructive notice of Plaintiff's rights to the ANIMAL PLANET mark, due to Plaintiff's federal trademark registrations").  Accordingly, this factor favors a finding of likelihood of confusion.

### 8.  Expansion of Product Lines

MGM has no current plans to venture into the fledging medical marijuana business. (Chaparian Decl. ¶ 15.)  Defendants likely do not intend to begin to operate world famous hotels and casinos and offer guest rewards programs any time in the near future.  Accordingly, this factor is neutral.

/ / /

5040152_1

### 9.  Conclusion on Trademark Infringement

Most of the factors favor a finding of likelihood of confusion.  Indeed, M LIFE and M'LIFE are effectively identical, confusion is all but guaranteed.  To the extent any confusion is dispelled after the consumer carefully investigates and discovers no connection between MGM and Defendants, the initial interest confusion is sufficient to constitute actionable infringement. *Brookfield*, 174 F.3d at 1063.  Based on the foregoing factors, MGM is likely to succeed on the merits of its unfair competition claim at trial.

### C.  MGM Will Likely Prevail On Its Cybersquatting Claim (Count IV)

The Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (the "ACPA") applies to the registration of domain names that are identical or confusingly similar to distinctive or famous marks.  MGM is likely to succeed on its claims under the ACPA.  The ACPA provides, in pertinent part, that:

> [A] person shall be liable in a civil action by the registrant of a mark . . . if, without regard to the goods or services of the parties, that person –
>
> (i)  has a bad faith intent to profit from that mark . . . and
>
> (ii)     registers, traffics in, or uses a domain name that –
>
>> (I)    in the case of a mark that is distinctive at the time of registration of the domain name is identical or confusingly similar to that mark; [or]
>>
>> (II)   in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . . .

15 U.S.C. § 1125(d)(1)(A).

Thus, liability under the ACPA attaches if the following three elements are satisfied: (1) the defendant has a bad faith intent to profit from another's trademark and either registers, traffics in, or uses that trademark in a domain name; (2) the plaintiff's mark was distinctive or famous at the time the domain name was registered; and (3) the domain name is identical or confusingly similar to the plaintiff's trademark.  *Id.*

Here, MGM is likely to succeed on the merits of its ACPA claim because each of the foregoing elements is satisfied.

/ / /

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

LEWIS ROCA
ROTHGERBER

-16-

**1. Defendants Have a Bad Faith Intent to Profit From Their Use of the M LIFE Marks**

In determining whether a person has a bad faith intent under the ACPA, a court may consider factors such as, but not limited to—

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)

15 U.S.C. § 1125(d).

Here, with respect to the first three factors (*i.e.*, whether the Defendants' have trademark rights in the M'LIFE Mark, whether the <www.mlifewellness.com> domain name consists of the Defendants' legal name, and whether the Defendants have made prior use of the M'LIFE Mark), Defendants have only very recently begun using the M'LIFE Mark. The entity "M Life, Inc." was formed in April 2014. (*See* Ex. B to Fountain Decl.) The remaining Defendant entities were

-17-

formed in July 2014 or August 2014.  (*Id.*)  The domain name  <www.mlifewellness.com> was registered in July 2014.  (*See* Fountain Decl. ¶¶ 3-4 & Exs. A & B.)  By April 2014, the earliest point in time at which Defendants may argue they began using the M'LIFE Mark, MGM had already long established the M LIFE Marks as well-recognized trademarks in Nevada, with its M LIFE rewards program having tens of millions of members and operating as one of the most recognized rewards programs in the industry.  (*See* Chaparian Decl. ¶¶ 4-10 & Exs. A-E.) Accordingly, the first three factors favor MGM.

Next, with respect to the fourth factor (*i.e.*, whether Defendants have engaged in any bona fide non-commercial or fair use), Defendants are unquestionably using M'LIFE in a commercial setting to advertise and promote a medical marijuana business.

Next, with respect to the fifth factor (*i.e.*, the Defendants' intent to divert customers), the Defendants' intent can be inferred from the fact that a simple search on the USPTO online registry would have revealed MGM's long-standing and well-recognized use of the M LIFE Marks.

Next, with respect to the sixth through the eighth factors (*i.e.*, the Defendants' offers to transfer the domain, use of false contact information, and registration or acquisition of multiple confusingly similar domain names), MGM has yet to discover evidence to support these factors. However, MGM believes that discovery will uncover information relevant to these factors.

Finally, as discussed above, the M LIFE Marks are conceptually distinctive, and indeed famous due to MGM's considerable marketing and advertising.  (*See* Chaparian Decl. ¶¶ 7-13 & Exs. B-F.)

Accordingly, when the Defendants registered the <www.mlifewellness.com> domain name, they had a bad faith intent to profit from MGM's M LIFE mark.

### 2.  M LIFE Marks Were and Are Inherently Distinctive

As discussed above, the M LIFE Marks, in use since 2010, are inherently distinctive and famous.  They were inherently distinctive and famous in July, 2014, when the Defendants registered the <www.mlifewellness.com> domain name.

/ / /

/ / /

5040152_1

### 3.   The Parties' Marks Are Confusingly Similar

Finally, Defendants' domain name contains MGM's M LIFE Marks verbatim.   Indeed, Defendants' domain name <www.mlifewellness.com> appears nearly the same as MGM's <www.mlife.com> domain.   For the foregoing reasons, MGM is likely to succeed on the merits of its cybersquatting claim.

In conclusion, MGM is likely to succeed on the claims it has brought in its Complaint and is entitled to an injunction against Defendants.[3]

## II.   IN THE ABSENCE OF A PRELIMINARY INJUNCTION, PLAINTIFF WILL CONTINUE TO SUFFER IRREPARABLE INJURY AND HARM

To obtain a preliminary injunction in a trademark case, the plaintiff must establish a likelihood of irreparable injury.   *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).   "[I]rreparable harm can rather easily be demonstrated by pointing to the fact that the trademark owner's business goodwill and reputation are in peril.   If it is likely that confused persons will mistakenly attribute to plaintiff defects or negative impressions they have of defendant's goods or services, then the plaintiff's reputation is at risk."   *McCarthy* § 30.47; *see also CytoSport v. Vital Pharmaceuticals,* 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009) ("[I]f another person infringes [a plaintiff's] marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control.   A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation.").   Notably, even the threatened loss of customers or goodwill is sufficient to establish irreparable injury.   *See, e.g.*, *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) ("The district court also did not abuse its discretion in finding that irreparable harm will likely result . . . Rena has provided evidence of threatened loss of . . . customers or goodwill . . . .") (internal quotations and citation omitted); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a

---

[3] While MGM believes it has shown likelihood of success on the merits, MGM also submits, in the alternative, that it has shown at least a serious question on the merits.   Because the balance of hardship (discussed *infra*), also tips sharply in its favor, MGM is entitled to an injunction under this alternative standard.   *Taylor*, 488 F.3d at 1200 (discussing alternate test for injunction).

-19-

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

LEWIS ROCA
ROTHGERBER

finding of the possibility of irreparable harm."); *Robinson v. Delicious Vinyl Records Inc.*, No. CV 13–4111–CAS (PLAx), 2013 WL 3983014, at \*7 (C.D. Cal. Aug. 1, 2013) ("As plaintiffs are the undisputed owners of the 'Pharcyde' musical brand and business, the promotion of defendants as an alternative 'Pharcyde' likely threatens plaintiffs' goodwill and reputation in the music community, in addition to their loss of market share.").Here, without a preliminary injunction, MGM has been and continues to be irreparably harmed by Defendants' use of the M'LIFE Mark in connection with its medical marijuana dispensary, website, and domain name.   Because Defendants' mark is nearly identical to MGM's mark, MGM may be wrongfully associated with the fledging business of medical marijuana such that consumers and individuals may think MGM has approved, or has some affiliation with the medical marijuana industry or Defendants. Moreover, medical marijuana is a controversial topic, and Defendants' use of a nearly-identical mark could draw negative and unwarranted attention to MGM that contradicts the positive image that MGM has spent years and millions of dollars building.

MGM's loss of control over its distinctive brand and business reputation is irreparable injury and justifies the entry of a preliminary injunction in this case.

### III.   THE BALANCE OF HARDSHIPS FAVORS MGM

The balance of hardships tips sharply in MGM's favor.  *See, e.g., California Cedar Prods. Co. v. Pine Mountain Corp.*, 724 F.2d 827, 831 (9th Cir. 1984) (holding balance of hardships favored plaintiff, the manufacturer of DURAFLAME firelogs, where the plaintiff had a major investment in such firelogs, had been the principal manufacturer of such firelogs since their introduction, and where the defendants had only minor claims at stake); *Brown Jordan Intern., Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1157 (D. Haw. 2002) (holding balance of hardships tips in plaintiff's favor because, in addition to economic hardship, plaintiff also runs the additional risk of damage to its reputation if its competitor's products are of lower quality than its own).

As discussed above, absent a preliminary injunction, MGM will suffer irreparable harm in the form of loss of control over its brand and positive company image associated with the M LIFE Marks.

-20-

5040152_1

LEWIS ROCA
ROTHGERBER

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

1    In contrast, if the Court grants MGM's motion, Defendants will merely be required to stop

2  using the M'LIFE Mark (or any other confusingly similar mark) for their business and on their

3  website.  Defendants' business only appears to have begun a few months ago (their dispensary also

4  does not appear to be open yet), so the cost to remove the infringing mark from its physical store,

5  website, domain name, and advertising materials should be minimal.   Moreover, Defendants

6  should not be heard to complain about any hardship – a simple search of the federal TESS registry

7  for M'LIFE would have informed Defendants that the nearly-identical M LIFE Mark has been in

8  use by MGM for several years.  It is common knowledge that MGM operates numerous world-

9  famous hotels and casinos in Las Vegas, Nevada.  Yet, Defendants chose to open their medical

10  marijuana dispensary in Las Vegas, Nevada and chose a business name that is near

11  indistinguishable from MGM's mark.

12  **IV.    THE PUBLIC INTEREST FAVORS THE ISSUANCE
          OF A PRELIMINARY INJUNCTION IN THIS CASE**

13

14    It is well established that trademark law protects not only the private interests of the

15  trademark owner but also the public's interest in not being confused by infringing products.  *See*

16  *Inwood Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 n.14 (1982) ("[T]he infringer deprives

17  consumers of their ability to distinguish among goods" of competitors).  Thus, the strong public

18  interest in preventing consumer confusion also favors granting a preliminary injunction in this

19  case.  Here, the two marks are virtually identical, consumer confusion is inevitable.

20  **V.    THE COURT SHOULD IMPOSE A BOND OF $1,000**

21    Given the narrow scope of relief requested by MGM, MGM proposes that a bond (or cash

22  deposit in lieu of a bond) in the amount of $1,000 is sufficient security to protect Defendants

23  against any damages arising from the issuance of the requested preliminary injunction.  MGM is

24  not seeking to stop Defendants from conducting their business, only to stop them from using a

25  confusingly similar designation for their business, on their website, and in their domain name.

26  Accordingly, a $1,000 cash deposit will function as sufficient security.

27  / / /

28  / / /

-21-

5040152_1

## **CONCLUSION**

For the reasons set forth above, MGM respectfully requests entry of an order preliminarily enjoining Defendants from using the M'LIFE Mark in connection the operation of a medical marijuana dispensary, on Defendants' website and on its domain name <www.mlifewellness.com>.

Dated: this 15th day of October, 2014.

LEWIS ROCA ROTHGERBER LLP

By: /s/ Michael J. McCue
Michael J. McCue
Jonathan W. Fountain
Meng Zhong
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996

*Attorneys for Plaintiff*
*MGM Resorts International*

5040152_1

-22-

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on October 15, 2014, I filed a copy of the foregoing document entitled,

3

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, with the Clerk of the Court via

4

the Court's CM/ECF system, and served a true and accurate copy of the same via First Class U.S.

5

Mail upon the following:

6

Erin L. Truman
HUTCHISON & STEFFEN

7

10080 W. Alta Drive, Suite 200
Las Vegas, NV 89145

8

etruman@hutchlegal.com

9

*Attorneys for Defendants*

10

*M Life, Inc., M'Life Wellness, LLC,*
*M'Life Nevada, LLC, Daniel Lutz,*

11

*and Darvin Gomez*

12

Dated: this 15th day of October, 2014.

13

14

_____/s/  Rebecca J. Contla_____
An employee of Lewis Roca Rothgerber LLP

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169-5996

LEWIS ROCA
ROTHGERBER

-23-

5040152_1